IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　 )　　　　Criminal No. 25-287
　　　　　　　　　　　　　　　　　　　)
MARISSA LYNN SEGAL　　　　　　　　 )

**UNITED STATES' SENTENCING MEMORANDUM**

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, United States

Attorney for the Western District of Pennsylvania, and Kelly M. Locher, Assistant United States

Attorney for said District, and respectfully submits its Sentencing Memorandum.  The parties agree

that an appropriate resolution of this case includes a term of imprisonment of not less than 90 months

and not more than 120 months (7.5 to 10 years).  For the reasons set forth below, the Court should

impose a term of imprisonment at the high-end of the parties' agreed-upon term of imprisonment,

which represents a just and reasonable sentence that achieves the statutory goals of sentencing

articulated in 18 U.S.C. § 3553(a).

I.　　　**PROCEDURAL BACKGROUND**

On January 12, 2026, Segal pled guilty to one count of Distribution of Material Depicting the

Sexual Exploitation of a Minor, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1), and one count of

Possession of Material Depicting the Sexual Exploitation of a Minor, in violation of 18 U.S.C. §§

2252(a)(4)(B) and (b)(2).  The Court accepted Segal's guilty plea, and scheduled sentencing to take

place on April 27, 2026.  ECF 13.  On March 6, 2026, the United States Probation Office issued the

Final Presentence Investigation Report ("PSIR"), finding that the guideline imprisonment range is

151 months to 188 months.  PSIR at ¶ 86.  The parties agree that the guideline imprisonment range

is correctly calculated.  ECF Nos. 19,  20.

1

## II.    <u>STATUTORY FRAMEWORK</u>

In determining the appropriate sentence, the Court must consider a number of factors, including:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).  Per the Presentence Order (ECF 13), the government addresses only those sentencing factors that it believes to be most relevant to the Court's determination of the appropriate term of incarceration in this case below.  ECF 13 at ¶ 10.

### A.  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

#### 1.  *The Nature and Circumstances of the Offense*

The nature and circumstances surrounding Segal's criminal offenses of distributing and possessing child sexual abuse material ("CSAM") are quite serious.  By Segal's own admissions to law enforcement, she exchanged videos and photographs containing CSAM in exchange for adult male masturbation content—and attention from other males generally—via mobile application Telegram.  With respect to one such individual, Segal stated that she "really liked talking" to the user "so I guess this [referencing the exchange and discussion of CSAM] is what we're gonna do now." For example, between June 10, 2025 and August 27, 2025, Segal participated in an ongoing conversation with Telegram user '@Mtndaddy1966':

2

| Sender | Receiver | Body of Message | Timestamp (EST) |
|---|---|---|---|
| @stitchisking | @Mtndaddy1966 | *[Sent a two minute and twelve second video. The thumbnail of the video depicts a prepubescent female approximately 6-8 years old performing oral sex on an unknown adult male]* | 06/10/2025 4:03 PM |
| @Mtndaddy1966 | @stitchisking | Fuuccckkkk yess | 06/10/2025 4:07 PM |
| @stitchisking | @Mtndaddy1966 | Hehe *wink tongue out emoji* | 06/10/2025 4:08 PM |
| @Mtndaddy1966 | @stitchisking | Id [*sic*] fuck that last girl really good | 06/10/2025 4:11 PM |
| @stitchisking | @Mtndaddy1966 | Hehe *wink tongue out emoji* feel that young pussy swallow your thick cock | 06/10/2025 4:11 PM |

In her interview with law enforcement, Segal attempts to explain away her comments to Telegram user 'Mtndaddy1966' as mere "fantasy talk" and claims that, for her, the conversation occurred under the auspices of "roleplay." When law enforcement asked Segal why she continued to send 'Mtndaddy1966' CSAM, she replied: "I only do it because, to be completely honest, he has a nice cock and I like watching him cum. I do."

Approximately one month later, Segal distributes additional CSAM to @Mtndaddy1966 in the following exchange:

| Sender | Receiver | Body of Message | Timestamp (EST) |
|---|---|---|---|
| @Mtndaddy1966 | @stitchisking | I love the video! | 07/14/2025 7:43 PM |
| @stitchisking | @Mtndaddy1966 | Thank you daddy, I have another few more that I think you will love! It's a baby and a dog | 07/14/2025 7:44 PM |
| @Mtndaddy1966 | @stitchisking | Omggg id [*sic*] love to see! | 07/14/2025 7:44 PM |
| @stitchisking | @Mtndaddy1966 | *[Sent 12-second video of a German Shepherd dog licking the anus of a four-month-old infant boy while his diaper and "onesie" style blue pajamas appear undone with the infant's penis exposed]* | 07/14/2025 7:45 PM |
| @stitchisking | @Mtndaddy1966 | *[Sent a 23-second video of a German Shepherd dog licking the open diaper and exposed penis of the same infant boy while the exposed penis of an adult male appears above the dog and baby]* | 07/14/2025 7:45 PM |
| @Mtndaddy1966 | @stitchisking | *Hottttttttttttttttttttfttt* [*sic*] | 07/14/2025 7:46 PM |
| @stitchisking | @Mtndaddy1966 | It's a guy on here who I met and he likes kids. That's his kid and dog. | 07/14/2025 7:57 PM |
| .. | | | |

| @stitcisking | @Mtndaddy1966 | I will send you more if hes *[sic]* does more | 07/14/2025 8:06 PM |
|---|---|---|---|
| .. | | | |
| @stitchisking | @Mtndaddy1966 | He wants to fuck his kid but he is worried about doing actual long term damage | 07/14/2025 8:06 PM |
| @stitchisking | @Mtndaddy1966 | ***[Sent an 8-second video of adult male ejaculating on the mouth of four-month-old minor]*** | 07/17/2025 3:59 PM |
| @Mtndaddy1966 | @stitchisking | He cum?! | 07/17/2025 4:00 PM |
| @stitchisking | @Mtndaddy1966 | That's what it looks like. If you haven't noticed it's the same guy and baby. He wanted a girl but got a boy. He still plays with him when no one is home. The doggies love licking him. | 07/17/2025 4:01 PM |
| @Mtndaddy1966 | @stitchisking | Fuucckk baby | 07/17/2025 4:01 PM |
| @Mtndaddy1966 | @stitchisking | You're making me want to cum so bad | 07/17/2025 4:02 PM |
| @stitchisking | @Mtndaddy1966 | Hehe *wink tongue out emoji* that's all he sent me today | 07/17/2025 4:02 PM |
| @Mtndaddy1966 | @stitchisking | Id *[sic]* love to watch anything | 07/17/2025 4:03 PM |
| @Mtndaddy1966 | @stitchisking | But that's hot | 07/17/2025 4:03 PM |

| @stitchisking | @Mtndaddy1966 | I know daddy, I am hoping for more videos | 07/17/2025<br><br>4:03 PM |
|---|---|---|---|

The aggravated nature of Segal's conduct is greatly exacerbated by the fact that she *knew* that some of the CSAM that she redistributed to Telegram user '@Mtndaddy1966' was homemade content produced by Jeremiah Monk[1] using his *four-month-old infant son*. She knew the content was homemade because Monk told her as much, and he personally appeared in some of the CSAM content alongside the infant boy. Indeed, law enforcement directly asked Segal whether she believed that any of the individuals on Telegram who sent her CSAM were personally producing the content using minor children. Segal confirmed that a man named "Jeremiah"—whose last name and location she claimed ignorance of—sent her CSAM videos featuring his four-month-old infant son. "His son is [] an infant, and he'll give his son a blowjob." Segal denied making any specific requests as to the type of conduct Monk would film with his baby, but admitted that she would encourage him "in a role-playing type thing" to "do it again." She noted that often, CSAM content was "just sent to her," though she admitted that she never questioned the men who sent her the CSAM, nor the origins of the content itself.

Despite admitting to having selfies of "Jeremiah's" face and knowing his first name and Telegram username, Segal chose not to report Monk's repeated and documented rape of his four-month-old son to law enforcement. In addition to subjecting the baby to the above-described acts of bestiality, Monk digitally penetrated the baby and ejaculated on the baby's mouth. For her part, Segal described that she did not go to the police because trying to find Monk would be akin to finding "a needle in a haystack." But instead of presenting law enforcement with the information she had,

---

[1] In November 2025, Monk was sentenced by a state court judge in Logan County, Ohio to serve 30 years to life in prison after pleading guilty to two counts of rape, two counts of pandering sexually oriented matter involving a minor, and sexual conduct with an animal.

she continued chatting with Monk on Telegram for more than a year. Segal even had information about Monk's Venmo username, because she once gave him money for gas after Monk informed Segal that he was stranded and Segal claimed to have "felt bad because of the little one." Every day that Segal continued talking to Monk was another day the infant boy was endangered. Simply put, Segal's repeated excuses for her actions ring hollow and her encouragement of the production of (and redistribution of) the CSAM content involving Monk's son, coupled with her failure to report definitive knowledge of live abuse to law enforcement, render her complicit in Monk's actions.

Segal's broader collection of CSAM featured, among other things, the oral, anal, and vaginal rape of infants and young toddlers, and victims engaged in acts of bestiality. At the time FBI executed the search warrant on her home, she had been engaged in trafficking CSAM content online for at least one year. In so doing, Segal significantly contributed to and injected new content into the marketplace for this illicit content.

As this Court well knows, "the 'victimization' of the children involved does not end when the camera is put away." *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). The consumption of child sexual abuse material (child pornography) perpetrates its proliferation. Consumers and traffickers of child pornography, like Segal, contribute to the cycle of abuse and are in part responsible for the psychological and physical harm of the children used to produce the images. *United States v. Yeaple*, 605 F. Supp. 85, 86 (M.D. Pa. 1985); see also *New York v. Ferber*, 458 U.S. 747, 759 (1982). The victims of child sexual abuse have no control over the continued circulation of the images and videos of their initial sexual abuse, allowing them to be exploited by Segal, her Telegram contacts, or anyone, at any time, all over the world.

### 2. *The History and Characteristics of the Defendant*

The United States has considered the self-reported information stated within defendant's sentencing memorandum concerning her unspecified abuse by an older male cousin when Segal was

6-10 years old.[2] ECF 23 at 2. No individual should have to endure what Segal did. Because the impact of such experiences often is long lasting, the United States submits that such information demonstrates that Segal should have understood the traumatic impact that her criminal conduct would have on her own minor victims. It would seem to follow that that a person who has experienced a traumatic event or events is more likely to empathize with another person going through similar trauma. Such life experiences, while certainly relevant sentencing considerations, cannot and should not excuse Segal's continued perpetration of such illegal acts.

**B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

The sentence must reflect the seriousness of the offenses, promote respect for the law, and provide just punishment. Congress has provided the Court with the first measure of the seriousness of the current crimes by designating both the Distribution and Possession of Child Sexual Abuse Material as felony offenses. Congress has further underscored the seriousness of the Distribution offense through the institution of a five-year mandatory minimum term of imprisonment as to Count One of the instant indictment. The current sentence must accurately reflect that seriousness. The sentence, however, must also promote respect for the law and provide for a just punishment. Promoting respect for the law is, from the perspective of the United States, a primary goal of sentencing that is very much aligned with the goal of general deterrence, as discussed below.

The defendant's sentence should reflect the gravity of the offense and the need for retribution such that the punishment fits and the crime and the defendant is punished justly. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). Child sex crimes are among the most egregious and despicable of societal and criminal offenses." *Id*.; *see also United States v. Foss*, 501 F.2d 522, 527 (1st Cir. 1974) (cited with approval in the legislative history of Section 3553(a)) ("[T]he view that punishment should fit the offender has never yet been held to eliminate general deterrence as a factor

---

[2] Note that this information does not appear in the PSR.

to be considered along with others . . . This is so even though general deterrence concerns itself not with the individual offender but with the sentence's impact on others.").

For the victims of the child sexual abuse material that Segal distributed and possessed, her crime caused further victimization and put a roadblock in their road to recovery from the trauma of their initial abuse. Some of them are still too young to understand the full implications of Segal's actions on the remainder of their lives. The Third Circuit in *United States v. Goff* observed, when Congress passed the Child Pornography Prevention Act of 1996, Congress found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." 501 F.3d 250, 259 (3d Cir. 2007) (citing Child Pornography Prevention Act of 1996 ("CPPA"), Pub. L. 104-208, sec. 121, 110 Stat. 3009-26, reprinted in 18 US.C. § 2251 note at 611); *see also United States v. MacEwan*, 445 F.3d 237, 249-50 (3d Cir. 2006). The Supreme Court explained: "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008). Digital images can live on indefinitely and so does the harm to the victims of child pornography. *See* U.S. Sentencing Comm'n, *Report to Congress: Federal Child Pornography Offenses*, at vi (December 2012), *available at* http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sexoffense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (child pornography offenses "result in perpetual harm to victims and validate and normalize the sexual exploitation of children"). The victims live in fear that the people they interact with have viewed the sexual abuse images and will recognize them, leading to difficulty in maintaining jobs, relationships, and an increase in alcoholism later in life. See *id*. at 112-13. These victims "suffer by knowing that

their images are being used by offenders for sexual gratification and potentially for 'grooming' new victims of child sexual abuse." *Id*. (footnote omitted).

Thus, the law is clear that child exploitation crimes warrant stringent sentences. Here, a sentence near the top of the parties' negotiated 7.5-10 year range of imprisonment—already a significant discount from Segal's applicable guideline range—will convey the seriousness of her offenses and promote respect for the law, particularly as to those individuals who, like the defendant, will victimize children privately online.

### III.    CONCLUSION

For all of the foregoing reasons, and in consideration of the facts and circumstances of this particular case, the United States respectfully requests that the Court sentence Segal to a term of imprisonment at the upper-end of the parties' agreed-upon 7.5-10 year range. Such a sentence is warranted in light of the Section 3553 factors, and will be sufficient but not greater than necessary to satisfy the statutory goals set forth by Congress at 18 U.S.C. § 3553(a).

Respectfully submitted,

TROY RIVETTI
United States Attorney

*/s/ Kelly M. Locher*
KELLY M. LOCHER
Assistant United States Attorney
PA ID No. 322400